UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal No. 13-CR-20063-DLG |
| | ) | |
| LAWRENCE FOSTER, | ) | |
| | ) | |
| Defendant. | ) | |

UNDERLINE

MOTION TO VACATE, SET-ASIDE OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. § 2255

COMES NOW the Defendant, Lawrence Foster, by and through undersigned counsel and files this motion pursuant to 28 U.S.C. § 2255 and moves this Court to vacate, set-aside or correct the judgment of conviction and sentence in this case. In support thereof, the Defendant shows:

1. The movant (hereafter "Foster" or "Defendant") was charged in a sealed wire fraud indictment which was returned by a grand jury sitting in Miami on January 31, 2013. (DE 3).

2. On May 2, 2013, a grand jury sitting in Miami returned a fifteen-count superseding indictment charging the Defendant and two others with various counts of wire fraud, money laundering and illegally structuring transactions. (DE 72)

3. The indictment charged the Defendant only in counts 1 through 8. Count 1 charged the Defendant, and both co-defendants, with conspiracy to commit wire fraud in violation of 18 U.S.C. §1349, from on or about December 2009, continuing to on or about January 31, 2013. Counts 2-8 charged the Defendant and Jordon McCarty with seven substantive counts of wire fraud in violation of 18 U.S.C. §1343 and 18 U.S.C. §2. The superseding

1

indictment also contained an extensive forfeiture count.  Foster was not named in counts 9-15.  (DE 72)

4. On September 23, 2013, trial commenced.  (DE 172)  After seven days of trial, the case was submitted to the jury on October 1, 2013.  (DE 191)  The next day, the jury returned a verdict finding the Defendant guilty on all eight counts.  (DE 196)  After the verdict, counsel for Foster filed a motion for a new trial alleging that an unredacted exhibit that had been excluded by an *in limine* order, had somehow made its way into the jury room during deliberations, thereby prejudicing the Defendant and tainting the deliberations.  (DE 212)

5. On March 31, 2014, after careful consideration, the trial Court entered a 21-page order which granted the motions for a new trial. (DE 272)

6. On October 6, 2014, the second trial in this case commenced with jury selection.  (DE 452)

7. Foster did not testify at trial.

8. Ultimately, the jury convicted the Defendant of counts 1-7 of the superseding as charged. (DE 375)

9. Pursuant to the Presentence Investigation Report (PSI at ¶68) and the Court's ruling, the Defendant's combined advisory guideline range at the time of his sentencing, was 135-168 months, (Offense Level 33, Criminal History Category I).  Accordingly, he was sentenced on September 1, 2015, to a total 152-month term of incarceration as to each of counts 1-7, to run concurrently with each other.  (DE 560: 33)(DE 538, 542)

10. A timely notice of appeal was filed, the appeal was perfected, and it was ultimately denied on January 4, 2018.  The mandate issued on March 6, 2018.

11. Foster currently has no other motions, petitions or appeals pending in this Court or any other court regarding the underlying judgment under attack.

12. This Petition under 28 U.S.C. § 2255 is timely filed.[1]

<u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

In order to succeed on a claim of ineffective assistance of counsel, a defendant must successfully satisfy each part of the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant must show both that his counsel was deficient and that the defendant was prejudiced because of the deficiencies. *Hanson v. Sherrod*, 797 F.3d 810, 826 (2015) Under *Strickland*, it is first necessary to examine whether "'counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" [*United States v. Kissick*, 69 F.3d 1048, 1054 (10th Cir. 1995)] (quoting *Strickland*, 466 U.S. at 687). Under the prejudice aspect of *Strickland,* the court must inquire whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kissick*, 69 F.3d at 1055 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  In order to establish the required prejudice, a defendant must demonstrate that counsel's deficient performance rendered the proceeding 'fundamentally unfair or unreliable.'" Id. (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 368-370, (1993).

<u>CASE OVERVIEW</u>

---

[1] The Judgment became final after the ninety day period in which Foster was afforded to file for a Writ of Certiorari.  The direct appeal was affirmed on January 4, 2018, meaning the one year time limitation to file under AEDPA began on April 4, 2018.  This Petition under 28 U.S.C. § 2255 must be filed no later than April 4, 2019. *See Kaufmann v. United States,* 282 F3d 1336 (11th Cir. 2002) (We join the Third, Fifth, Ninth, and Tenth Circuits in holding that even when a prisoner does not petition for certiorari, his conviction does not become "final" for purposes of § 2255(1) until the expiration of the 90-day period for seeking certiorari.)

Paradise is Mine (hereinafter "PIM"), was a real estate marketing and sales company with offices in Miami Beach, Florida. The company was established by Lawrence Foster in furtherance of an initiative to sell lots of real estate in Rum Cay, Bahamas and other Bahamian Islands as a co-owner with Sunward Holdings. Upon embarking on this business venture, Mr. Foster performed necessary due diligence by utilizing in house counsel Frank Ferrari and other lawyers who took measures to confirm that Sunward had clear title to the land PIM was endeavoring to market and sell. PIM did so by amassing and reviewing title opinions which had previously been rendered in the Bahamas, concluding that Sunward had clear title to the land in question. PIM also took the further step of retaining an attorney from the United States, Mr. Joe Cox, to review the Bahamian title opinions concerning the methods used in their analyses. In years past, Mr. Cox rendered title opinions in the United States, before the advent of title insurance companies. After his review of the Bahamian title opinions relating to Sunward's ownership, Mr. Cox opined that the methodology used in the Bahamian title opinions was consistent with that which used to be employed in the United States. PIM and Sunward entered into a written contract, which, among other things, granted PIM an ownership interest in all 16,500 acres that Sunward owned in the Bahamas; granted PIM the exclusive right to market and sell the land PIM co-owned with Sunward in Rum Cay; and granted PIM the right to hypothecate parcels of the property to use as collateral to obtain secured loans.

PIM developed marketing materials and established a website which contained written information, photographic images and videos clips relating to the Rum Cay project. (Gov't Ex.: 515) As a further part of its marketing campaign, PIM also engaged the services of Vocus, a press release distribution company which specializes in distributing press releases to news media and other publications. PIM contracted with Vocus to distribute press releases to electronic media

sections of various publications in order to promote its projects. Once a press release was distributed and appeared in a publication PIM would take screen shots of the press releases as they appeared and would create marketing materials and re-post them on its website.

Ms. Rhonda Harper had a distinguished career in marketing and public relations and was called by Mr. Foster to testify as an expert on those subjects. She explained that press releases are written documents that address newsworthy topics and are distributed to media outlets. Also, that a press release is created by retained public relations firms or by companies themselves and are intentionally formatted to resemble news articles, in that they have a headline, a sub-headline, indicates the date when it was released and also the city where it originated. Ms. Harper explained how such press release distribution companies as Vocus are prevalent, and detailed the process by which press releases are generated and distributed – including that, before distribution, press release companies approve press releases for newsworthiness and to ensure that they are formatted to resemble news articles and not advertisements. She also explained that, when distributed, computer algorithms use "key words" to cause the press releases to be picked-up and posted on the digital press release sections of the various news organizations and publications with which the press release companies have relationships. After press releases posts, the press release companies send their customers reports which indicate which publications posted them. Though the postings may be visible on the internet for only a few seconds or minutes, the practice and expectation is that the customer locates the postings, takes screen shots of them, and use them in their marketing material. Most importantly, Ms. Harper testified that the press releases that PIM created and posted on its website looked the same as all the others she has seen, and that, though the general public is oblivious to the process she described, it is standard practice for how press releases are generated and used.

Pursuant to Bahamian law, PIM elected to sell Real Estate Options to potential property purchasers in order for them to maximize their potential profits. The reason was that PIM's client base, were people interested in purchasing land for resale and investment purposes only. By offering its clients an Option to a specific parcel of real estate instead of selling them a parcel of land "conventionally", the potential purchaser could avoid paying the government mandated Stamp Tax ranging from 6% to 10%. Under Bahamian Law the Stamp Tax only is required to be paid by the ultimate end user, i.e. the buyer who wishes to obtain title. By providing Options, Purchasers may then sell their property ownership rights to another purchaser interested in owning and holding the property for the long term at their sole discretion. A purchaser of an Option does not have to pay the stamp tax to perfect his or her ownership interest in a specific parcel of land to still have the ability to resell it or to otherwise leverage it as a financial asset. Once an Option is sold to a Purchaser it is filed within The Bahamian Department of Registry, which fully documents their ownership interests with The Bahamian Government. PIM's structure saves the short term investor the need to pay the stamp tax, a process that is 100% legal under Bahamian law as verified by PIM's in house counsel Frank Ferrari and via a legal opinion provided to the company by Bahamian Lawyer Wayde Chirstie. When purchasing an Option the Purchaser is provided exclusive rights to a specific parcel of real estate that they can exercise totally upon their discretion. The details of PIM's transactions were fully disclosed to the clients and clearly spelled out in the contract with its clients. The Option contract afforded the purchasers a lengthy window of time within which to either resell their land before having to pay the stamp tax, or to pay the stamp tax and obtain their title. The terms were clearly detailed in the written contracts, including that the purchasers were buying an option to purchase the land and they could either resell or pay the stamp tax to secure title within a given period of time. The stamp tax was not to be collected by PIM or

Sunward and no portion thereof was owed to PIM or Sunward. Nor was any additional money or payments owed to PIM or Sunward in order for a buyer to resell his/her lot or obtain title thereto. Landowners in the Bahamas may also record their ownership interest with the Registrar of General, which is the Bahamian repository for serving notice of such interests. PIM notified Sunward of the sale and, in turn, Sunward filed the option contract with the Registrar General, thus serving public notice that it acknowledges the transfer of interest in the real property at issue.

PIM and Sunward contemplated that PIM would need to borrow money in order to fund its operation. They opted for PIM being able to solicit secured loans by offering lots of real estate as collateral, and they memorialized that provision in the PIM/Sunward Agreement. Thereafter, PIM successfully solicited a number of loans as planned, and entered into Loan Agreements with the lenders. The Loan Agreements stated the loan amount and interest rate, identified the lot being pledged as collateral, and detailed the payment schedule. Each loan was collateralized by a lot of real estate in Rum Cay that Sunward and PIM jointly owned, and the lenders understood that their loans were collateralized. Also, PIM notified Sunward of each lot it had been assigned as collateral and Sunward set it apart from the ones being offered for sale.

Mr. Foster developed relationships with celebrities in order to expand the brand of PIM and its properties. He offered certain celebrities the ability to acquire a real-estate option in consideration for them performing certain promotional services on PIM's behalf, and granting PIM the right to announce the fact of their ownership. Some of the celebrities who accepted Mr. Foster's proposal include singer Anaida, former NBA player Clyde Drexler, Olympic gold medalist Carl Lewis, and former NFL players Joe Montana, Ray Lewis and Warren Moon who's Option Contracts were introduced into evidence at trial and were all registered with The Bahamian Registry of Records.

PIM and Lawrence Foster operated the business in good faith and relied on the advice of in house counsel as well as other attorneys and reputable industry professionals.  No client could truthfully make the claim that they had not received whatever they had contracted for. At the time of its shuttering there was no money owed by PIM to any of its lenders and all Option owners received what they were due contractually.

## GROUND I

TRIAL COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO PRESENT A "GOOD-FAITH" AND/OR A "GOOD-FAITH RELIANCE UPON OF COUNSEL" DEFENSE

Discussion

Foster was charged with six separate counts of wire fraud and one count of conspiracy to commit wire fraud.  In order to obtain a conviction for conspiracy to commit wire fraud, a defendant must have committed or planned to commit wire fraud. Therefore, we will primarily focus on the elements of wire fraud and how a good-faith defense would have prevailed.

Under 18 U.S.C. §1343

It's a Federal crime to use interstate wire, radio, or television communications to carry out a scheme to defraud someone else. The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

(1) The Defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;

(2) The false pretenses, representations, or promises were about a material fact;

(3) The Defendant acted with the intent to defraud; and

(4) The Defendant transmitted or caused to be transmitted by [wire] [radio] [television] some communication in interstate commerce to help carry out the scheme to defraud.

The term "scheme to defraud" includes any plan or course of action intended to deceive or cheat someone out of money or property by using false or fraudulent pretenses, representations, or promises.

A statement or representation is "false" or "fraudulent" if it is about a material fact that the speaker knows is untrue or makes with reckless indifference to the truth, and makes with the intent to defraud. A statement or representation may be "false" or "fraudulent" when it is a half-truth, or effectively conceals a material fact, and is made with the intent to defraud.

A "material fact" is an important fact that a reasonable person would use to decide whether to do or not do something. A fact is "material" if it has the capacity or natural tendency to influence a person's decision. It doesn't matter whether the decision-maker actually relied on the statement or knew or should have known that the statement was false.

The "intent to defraud" is the specific intent to deceive or cheat someone, usually for personal financial gain or to cause financial loss to someone else.

The Government does not have to prove all the details alleged in the indictment about the precise nature and purpose of the scheme. It also doesn't have to prove that the material transmitted by interstate [wire] [radio] [television] was itself false or fraudulent; or that using the [wire] [radio] [television] was intended as the specific or exclusive means of carrying out the alleged fraud; or that the Defendant personally made the transmission over the [wire] [radio] [television]. And it doesn't have to prove that the alleged scheme actually succeeded in defrauding anyone.

To "use" interstate [wire] [radio] [television] communications is to act so that something would normally be sent through wire, radio, or television communications in the normal course of business. Each separate use of the interstate [wire] [radio] [television] communications as part of the scheme to defraud is a separate crime.  *[11th Cir. Ct. App. Pattern Jury Instruction 51]*

The Government's burden of proof is only to exclude any reasonable doubt from the jurors'

minds. If one of the four elements listed above cannot be proven, then the jury must acquit the

defendant.  The primary element here is whether or not Foster acted *"with the intent to defraud."*

Simply stated, if the Government could not prove (beyond a reasonable doubt) that Foster had the

intent to defraud his customers or clients, the Government could not obtain a conviction.

9

The "Good-faith" and "good-faith upon the reliance of counsel" are separate but recognized defenses in cases where the charges alleged are based upon fraudulent intent. They are specifically designed jury instructions that are associated and used with this defense strategy in order to lawfully and intelligently inform the jury regarding their options during deliberations.

The "good-faith" defenses are more than just the absence of proof that there was fraudulent intent; they are demonstrative, such that a defendant was following the advice of an attorney and/or the defendant had an honestly held opinion or formed belief as to why they acted the way that they did. Moreover, if a defendant's honestly held opinion or formed belief is mistaken or foolish, the honestly held opinion or mistaken belief will prevail and defeat the allegation of fraudulent intent.

The 11th Circuit Court has pattern jury instructions for good-faith and good-faith upon reliance of counsel.

11th Circuit Pattern Jury Instruction 17
Good-Faith Defense

"Good-faith" is a complete defense to a charge that requires intent to defraud. A defendant isn't required to prove good-faith. The Government must prove intent to defraud beyond a reasonable doubt. An honestly held opinion or an honestly formed belief cannot be fraudulent intent – even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management, or carelessness can't establish fraudulent intent. But an honest belief that a business venture would ultimately succeed doesn't constitute good-faith if the Defendant intended to deceive others by making representations the Defendant knew to be false or fraudulent. [2]

11th Circuit Pattern Jury Instruction 18
Good-Faith Reliance upon Advice of Counsel

Good-faith is a complete defense to the charge in the indictment because the Government must prove beyond a reasonable doubt that the Defendant acted with [intent to defraud] [bad purpose to disobey or disregard the law] [a specific intent to violate a known legal duty]. Evidence that the Defendant in good-faith followed the advice of counsel would be inconsistent with such an unlawful intent.

---

[2] This instruction was given at trial only because it was requested by co-defendant's attorney. It was not requested by or used by Attorney Howard.

Unlawful intent has not been proved if the Defendant, before acting:

• made a full and complete good-faith report of all material facts to an attorney he or she considered competent;

• received the attorney's advice as to the specific course of conduct that was followed;

• and reasonably relied upon that advice in good-faith.

The purpose of making an informed strategic decision to employ a combination of these defenses is to simplify the defense and not put the defendant in a position where he would be required to rebut every piece of evidence and word of testimony offered by the Government.  In the instant case, the Government took a position that:

1. Paradise is Mine (PIM) did not actually own the property it was selling or using for collateral and was purposefully hiding the name of Sunward Holdings and Billy Davis because their involvement in the ownership somehow clouded the title of the property.

2. Foster had deceived buyers and clients when press releases were represented as articles in an effort to induce them to purchase from, or lend money to Paradise is Mine.

3. Foster had deceived buyers and clients by claiming that certain celebrities had acquired or bought land within the real estate project.

<u>Ownership Of The Property:</u>

During the trial and at a post-trial Rule 29 hearing, held on March 16, 2015, Foster's trial counsel repeatedly fought against the Government's unfounded assertions that PIM had no ownership interest and the title to the property was clouded.  The Government never offered any evidence to support their position but rather maintained that PIM purposefully concealed the name of Billy Wayne Davis and Sunward Holdings because Davis was a convicted felon and had been

involved in a property ownership dispute in the past.[3]  Ken Toppin testified that it was his opinion

that the title was clear and the agreement entered into by PIM and Sunward that gave PIM full

ownership rights of the property.  The agreement granting an ownership interest to PIM was

entered as evidence.[4] The Government continued to claim otherwise.[5]  The issue was disputed and,

therefore, it would be left up to the jury to decide.  Without arguing a *Good-faith* defense, the jury

had only two questions to determine:

1. Did Paradise is Mine own the property and have the right to sell and borrow against it? Or

2. Did Paradise is Mine commit fraud by selling and borrowing against real estate that was

   not their property?

Had counsel argued a *Good-faith* defense (Upon reliance of Counsel), the jury would have

had another option.  This third option was that the jury could have found that PIM had a competent

attorney to which Foster had made a full and complete good-faith disclosure of all material facts

to and that Foster received the attorney's advice regarding the specific course of conduct that he

followed and reasonably relied upon in good-faith.  The point here is that the jury would not have

to decide the issue of whether the property title was disputed, but rather whether Paradise is Mine,

i.e., Lawrence Foster, was acting on advice of counsel and honestly believed that he had every

---

[3] Billy Wayne Davis was never charged in this case nor was there any evidence submitted alleging that he committed a crime in this case.

[4] PIM acquired 5 additional Title Opinions including one at the time of the indictment, from pre-eminent Bahamian attorney Thomas Evans, Esq. - a distinguished member of the Queen's Counsel appointed by Queen Elizabeth.  All of the Title Opinions stated that the subject properties were in full compliance with Bahamian Law and the clients were provided Good and Marketable Title both to the Lenders and Purchasers. PIM's documentation indicates that it was fully compliant with Bahamian Law.  The company relied on these legal opinions in order to market properties in which it had an ownership interest.

[5] Trial counsel called Agent Cade Cannon to testify during the defense's case. (TT. 1457-1511)  Agent Cannon had continually ignored the contractual agreement between Sunward and PIM that transferred an ownership interest to PIM, the title opinions indicating the title was not clouded, and he continually ignored the fact that not one single client of PIM claimed that they had not received what was contractually required. 100% of PIM's contractual obligations were fulfilled as of the date the Government arrested Foster.

right to sell and borrow against the land as per the written agreements. This would have been a much tougher burden for the Government to overcome because, in essence, there was no fraudulent intent.

Press Releases

During the trial and at a post-trial Rule 29 Hearing, (held on March 16, 2015) Foster's trial counsel repeatedly fought against the Government's assertions concerning the press releases. The Government called witnesses from the *Wall Street Journal* and *USA Today* that testified their publications had never authored an article on PIM. Trial counsel presented an expert witness, Rhonda Harper, who testified how press releases are used in today's promotional settings. Specifically, she testified that press releases are written by a company seeking to promote their product in a preferred format and delivered to a promotions or distribution company in order for that company to do a mass distribution. PIM used a company called Vocus (PRWeb) to accomplish this task. Ms. Harper testified that the press releases would be picked up and displayed by multiple sources, and a company like Vocus would issue a report to its customer (PIM) that listed the publications that ultimately picked up and displayed the press release. She testified that this is how the business works and is an everyday common occurrence. PIM had spent at least $60,000.00 for the services that Vocus provided in order to promote PIM's properties. As we can see, this is another issue that was in dispute because the Government was claiming that it was fraudulent for PIM to make these claims by saying they had been featured in numerous publications, while the defense claimed that Vocus was reporting to Foster that the press releases were picked up and displayed by all these publications. The issue here was hotly disputed. Efforts were made by the defense and the Government to define terms such as articles, featured,

publication, and published, all in an effort prove their point. [6] Once again, PIM obtained and relied on its in house counsel approval of all of the marketing terms utilized in its press releases, on its website, and all other marketing materials. A key issue for the Government was whether or not PIM had ever appeared in digital form in the *USA Today* while the defense insisted that a press release had actually appeared in a digital form even though it may have been for a short period of time. Foster's trial counsel had failed to investigate, contact or subpoena *USA Today* or *Wall Street Journal* before the trial to obtain copies from the archives definitively proving that the press releases did in fact appear in article form as represented. This would have totally negated the frivolous incorrect testimony of both of the publication's witnesses. Foster's trial counsel had the benefit of the past trial, nearly a year earlier, to utilize it as a roadmap to be able to prepare for the inaccurate testimony of each respective witness and he failed to do so. Unfortunately, the focus became so narrow that the Government prevailed. Without arguing a *Good-faith* defense, the jury had only two options:

1. Did a printed news article appear in (the publication)?

   Or

2. Did something other than an article appear, or nothing at all?

Had counsel argued a *Good-faith* defense here, the jury would have had another option. This third option was that the jury could have found that based upon the fact that PIM had hired a promotional company called Vocus (PRWeb), and that company advised them of how to promote the company's products in today's digital media era, then Foster had an honestly held opinion or an honestly formed belief that he was acting within normal business practices. Therefore, his use

---

[6] Defense counsel failed to introduce the common dictionary and / or legal dictionary definitions into evidence of such terms during its case-in chief. Irrespective of the government's position the definitions PIM utilized in its marketing materials were in complete legal compliance with how they were published and were reviewed and approved by it's corporate counsel

of press releases cannot be fraudulent intent regardless of how the client customer interpreted the claims of PIM being featured in so many publications. Additionally, the accuracy of the press releases was disputed by the Government because the Government continually claimed that PIM falsely represented themselves as the owner of the property.

The Celebrities

During the trial and at a post-trial Rule 29 Hearing, held on March 16, 2015, Foster's trial counsel repeatedly fought against the Government's assertions that Foster and PIM fraudulently misled clients by claiming that Joe Montana had purchased land from PIM. The Government tied this together with their other claims that PIM did not own the property in order to sell it to the celebrities and that any press release that claimed the celebrities bought or acquired land must also be fraudulent. Trial counsel presented evidence of an agreement between Joe Montana and PIM transferring ownership of land to Joe Montana for endorsement and promotional services utilizing them as consideration and a medium of exchange. The contract with Montana was drafted, approved and negotiated by Frank Ferrari, PIM's corporate counsel Again, this was an issue in dispute where each side presented evidence to support their position. Without arguing a Good-Faith defense, the jury had only two options:

1. Did Joe Montana actually purchase/ acquire land in the sense that most people purchase land here in the United States?

2. Or was this not really considered a purchase or acquisition because the value exchanged was not cash?

Had counsel argued a Good-Faith defense, with or without the good-faith reliance on counsel, the jury would have had another option. This option was that the jury could have rendered a verdict based upon the fact, that PIM had a competent attorney who had prepared and reviewed

the endorsement contracts of the celebrities and Foster received the attorney's advice that he followed and reasonably relied upon in good-faith.  Because of the advice of counsel, Foster had an honestly held opinion or an honestly formed belief that he was acting within normal business practices. The point here is that the jury would not have to decide the issue of whether the property was sold to the celebrities in the manner to which a testifying victim believed was a sale. Instead, the jury would only have to determine if Foster reasonably relied on his attorney's advice and his rational belief that a recorded option contract to sell land for value other than cash was considered a purchase and once the client, Joe Montana, had exercised the option, PIM was within their right to announce the acquisition by issuing a press release.[7]

After considering the overall defense strategy of a "Good-Faith" and "Good-Faith Based Upon the Reliance of Counsel", it is easy to see where and how trial counsel was deficient and how trial counsel's failure to present either one or both viable "good-faith" defenses prejudiced Foster.

In order to convey the defendant's theory of defense to the jury, the trial attorney must develop a theme for the case.  The theme here was that Foster acted in good-faith (and upon reliance of counsel) and did not have any criminal intent to defraud clients and take their money. A proficient attorney would consider what they want the jury to take away from the case after hearing the testimony. The theme allows the jury to focus on the most important aspect of the case without getting bogged down in all the unnecessary minutiae.  Properly presented by a competent trial counsel, the theme is a reference point that is revealed to the jury in the opening statement and is a line of reasoning to which the juror returns to and relies upon, in order to understand witness testimony and the presentation of evidence.  The theme should remain simple and be

---

[7] The deal structure for the acquisition and the verbiage "acquisition" was pre-negotiated by Foster's in house counsel, Frank Ferrari, within the "Professional Services Agreement".

16

connected to each witness.  Finally, trial counsel's closing argument should drive home the theme

of the case by tying together the all of the evidence and explaining how the evidence fits the good-

faith defense jury instruction.  Good-faith was the theme here and it should have been introduced

during the opening statement, reiterated at every possible chance while questioning witnesses, and

highlighted during the closing argument of trial counsel with the inclusion of a proper good faith

upon reliance of counsel jury instruction. The following individual deficiencies are intended to be

considered collectively as one claim when considering this claim of ineffective assistance of

counsel alleged in Ground One.

A.

COUNSEL FAILED TO INTRODUCE AND EXPLAIN A GOOD-FAITH  DEFENSE
DURING OPENING STATEMENT

The opening statement is one of the most important components of any trial. It is the

attorney's first opportunity to present the case to the jury, and to shape the jury's perspective of

the entire trial. The opening statement also is the first opportunity to present the defense that will

be used throughout the entire trial.  In most situations, this is not the time to tell the jury what legal

questions will be the subject of their deliberations. Sometimes, however, counsel should reference

legal questions in the opening statement to give the jury some context for the subject of the trial.

For instance, in the instant case, counsel could tell the jury they will be asked to decide whether

Foster had acted in good-faith because he relied on the advice of his attorney and because he had

hired and relied on a promotions company to help get the company known. As long as the legal

questions are broadly framed, the judge would likely allow the lawyer some latitude.

This was the time for trial counsel Howard to tell the jury the evidence will show that PIM

and Foster had hired attorneys that advised Foster; that the title to the property was clear; that the

agreement granting an ownership interest was valid, and the method of selling the property by way

17

of an option contract was lawful.  It was also the time to tell the jury that PIM and Foster had utilized in house attorney to draft and approve professional services contracts with celebrities that transferred property to celebrities for promotional services.  Trial counsel should have also informed the jury that PIM and Foster hired a communications company called Vocus (PRWeb) for marketing and public relations.

The jury had already heard what evidence the Government planned on presenting to support their theory that PIM and Foster had fraudulently induced the clients so that they could take money from them.  Had counsel advised the jury that he would be presenting evidence of attorney advice and the use of Vocus, he would have been able to explain how Foster's actions were all done in good-faith.  Counsel could have told the jury that the judge will instruct them at the end of the case that if they found Foster had acted in good-faith -based upon advice of counsel; and if the circumstances indicated, then Foster had an honestly held opinion or an honestly formed belief, that his actions were done in the absence of fraudulent intent – even if the opinion or belief is mistaken.  Trial counsel could have told the jury in his opening statement that the evidence would show that the Defendant acted in good-faith, which is why upon the conclusion of the case he would ask them to return a verdict of not guilty.  Counsel's performance was deficient for failing to state from the first opportunity in his opening statement and for failing to reiterate throughout the trial that they were relying upon a good-faith defense.

Prejudice

Counsel's deficient performance here disregarded a combination of two related but viable defenses.  Had counsel announced his intentions to present a good-faith defense, the jury would have been able to relate to and evaluate all of the testimony and evidence to determine if Foster was advised by counsel and or had reason to believe that he was doing the right thing.  Counsel's

failure to introduce the good-faith defense caused the jury to have to render a verdict without regard to Foster's intent. A good-faith defense allows a defendant, like the Defendant in this case, to be mistaken in his belief, so long as it is reasonable to believe there was an honestly held opinion or an honestly formed belief that caused his action and a good-faith reliance of counsel is an honestly formed belief. Counsel's deficient performance by failing to advance a good-faith defense under these set of facts rendered the trial fundamentally unfair.

### B.
### COUNSEL FAILED TO INTRODUCE AND CALL WITNESSES IN SUPPORT OF A GOOD-FAITH DEFENSE UPON THE RELIANCE OF COUNSEL

Deficient Performance

Foster's Trial Counsel rendered deficient performance by failing to call attorney Frank Ferrari to testify. Frank Ferrari was the in house attorney for PIM that had reviewed the entire business plan of PIM. Ferrari had an extensive real estate background and he not only approved but co-authored the option purchase contracts as well as the celebrity endorsement agreements. Frank Ferrari had also been instrumental in previewing and approving all of the content that published on the company's website in addition to its marketing materials and representations as well as acceptable marketing terms and press releases.

In order to for a defendant to use a good-faith on reliance of counsel defense, it is not necessary for the defendant to demonstrate specific factual elements, but rather provide enough evidence to suggest that the defendant was relying on the advice of counsel. Attorney Ferrari would have testified in a manner that was above and beyond what was required to justify the giving of the good-faith jury instruction. In fact, Ferrari would have testified sufficiently as if good-faith reliance of counsel was an actual affirmative defense. Specifically, Ferrari would have testified that he was made aware of all material facts concerning the ownership of the property and the

marketing plan to sell the individual lots by way of option contracts or use them as collateral for funds borrowed by PIM. Ferrari would have testified that he advised PIM and Foster that this was a lawful way to conduct business. Additionally, Ferrari would have testified that the use of press releases and celebrity endorsements were not only lawful business practices but that he approved them. Finally, Ferrari would have also testified that there was no legal requirement to disclose information about Sunward Holdings and that the title opinions spoke for themselves. Frank Ferrari was available to testify and Lawrence Foster had informed trial counsel that Ferrari should testify.

## Prejudice

Had Foster's trial counsel called Frank Ferrari as a witness, the results of the trial would have been different. First, Foster would have had the benefit of an additional jury instruction that would have allowed the jury to acquit him based upon his good-faith reliance on the advice of counsel. Secondly, the jury would have heard testimony from an attorney that rebutted the Government's unsubstantiated claims that PIM was not the owner of the property and that an option contract is not a transfer of property. Lastly, substantive evidence would have been introduced that proved the option contracts transferred the ownership of the land to the purchaser without reservation and the lenders were fully collateralized as per the lending agreement.[8] Counsel's deficient performance effectively negated a viable defense rendering the trial, fundamentally unfair.

## C.
### COUNSEL FAILED TO INTRODUCE AND CALL WITNESSES IN SUPPORT OF A GOOD-FAITH DEFENSE AND TO USE THE THEME OF GOOD-FAITH WHEN QUESTIONING THE DEFENSE WITNESSES THAT WERE CALLED

---

[8] The government's position which was ultimately adopted by the court was that the purchasers of land and the lenders had not received anything of value. This position caused the sentencing range to be enhanced by 20 levels.

Counsel rendered ineffective assistance by failing to call additional witnesses in support of a good-faith defense. To present the ongoing theme of good-faith throughout the trial counsel should have called additional witnesses as well as elicit testimony of good-faith from two of the defense experts that did testify.

Counsel had called Ken Toppin to testify. Toppin was previously an attorney and was the director of Sunward Holdings. At one point, Toppin was retained to provide a title opinion for the land on Rum Cay. Toppin testified that the title to the property was not clouded and that he actually obtained a Lloyds of London policy for one million dollars on the title. Toppin also testified that the agreement between Sunward and PIM was valid and that it gave PIM a ownership interest in the property. Additional questions could have been asked by counsel that would have elicited an answer that supported Foster's belief that all the business dealings between Sunward and PIM were legitimate and they were not hiding any facts for some nefarious reasons. This was a perfect time for counsel to ask about the actual signed conveyances there were held in escrow. The written conveyances were signed, dated and notarized, demonstrating that PIM had fulfilled all contractual requirements without any intent to take money from its clients without giving what was bargained for. The documents could have been entered into evidence as proof that the clients actually received something of value. This would have allowed counsel to return to the theme that Foster had an honestly held opinion or an honestly formed belief, *i.e.,* a good-faith defense that his actions were proper and, therefore, he had no fraudulent intent.

Counsel called Rhonda Harper, who was deemed an expert in public relations and marketing to testify about how the digital media industry worked for promotions with the use of

press releases.[9] She was a great witness for the defense and thoroughly explained how the industry standard operate for companies to write press releases and pay a distribution company like the one PIM used (Vocus) to get publicity for your products or brand. She testified about the process of how a press release could be picked up and displayed my several media outlets, even if it was displayed for a very short period of time. The purpose of the display was so that the company could take a screen shot of the article or release with the banner of the digital media source and utilize it as part of its marketing efforts. In other words, she described the exact process that was used by Foster and PIM. An additional question could have been asked by counsel that would have elicited an answer that supported Foster's belief that all the statements on the company website regarding PIM being featured in 377 publications were true statements. If asked, Rhonda Harper would have confirmed that anyone using Vocus (PRWeb) would have an honestly held opinion or an honestly formed belief that his actions were proper and therefore he had no fraudulent intent.[10] This would have continued the theme and tied the defense into another witness. It would have detracted from the never ending argument about the definitions of article, publish, and featured and rather would have allowed the jury to focus on what really mattered: Foster's lack of criminal intent while issuing press releases, that were all preapproved by his attorney, is what really mattered.

Prejudice

Had counsel questioned witnesses Ken Toppin and Rhonda Harper in the manner prescribed above, the results of the trial would have been different. First, there would have been

---

[9] Among the many positions that Ms. Harper held during her career, she was the chief marketing officer and in charge of all marketing, advertising, public relations, and research for Walmart / Sam's Club globally.

[10] Vocus had the final approval of all press releases that they would distribute and is the company used by many Fortune 500 companies.

tangible evidence introduced that the clients had received something of value. This value could have been used to offset the intended loss amount if Foster was convicted. Next, the continuing theme of good faith would have been connected to two very important defense witnesses and would have focused the attention of the jury on what mattered most. What mattered was the intent of Lawrence Foster and was it reasonable to believe that, based upon the witness's testimony he had an honestly held opinion or an honestly formed belief that his actions were proper.

*Attorney Howard Shapiro*

Counsel failed to call an expert on real estate and contract law. Foster had identified and requested counsel to call attorney Howard Shapiro, a noted law professor and legal expert with over 40-years' experience on real estate from the University of Miami. Shapiro had already reviewed the evidence and was both willing and available to testify. Shapiro would have been able to explain the legality and purpose of the option structure and how it established property ownership. PIM had completed their contractual requirements to transfer the property to the individual purchasers by filing the option contracts with the Department of Registry in The Bahamas. One final step was required by the individual purchasers, and that was to pay the required transfer tax.[11] All purchasers were fully aware that they needed to pay a transfer tax of between 6% and 10% only if they elected to keep the property. This was necessary if the Purchaser wanted to build on the property and was clearly disclosed and agreed to in the contract. Shapiro would have also testified that the lending contracts were fully collateralized by a deed to secure debt on the underlying property that PIM disclosed to the lenders as the collateral. Defendant argues that this would not have been cumulative and his testimony was necessary because it would have been from an independent third-party who was not affiliated with either PIM or Sunward Holdings.

---

[11] The Purchasers were not required to pay the tax if they chose to sell the property to another party thereby increasing the return of their investment.

Both Frank Ferrari and Ken Toppin were connected with PIM and Sunward.  Therefore, Shapiro's credibility as an independent expert would likely add to the credibility of the good-faith defense.

There was a second beneficial reason why Howard Shapiro should have testified. Notwithstanding the good-faith argument, Shapiro's testimony would have tilted the scales in determining that the lenders and the purchasers of the property lots on Rum Cay actually received something of value.  Shapiro's testimony would have been substantive evidence that could have been used in determining the intended loss and actual loss amounts.  The Court ruled that the intended loss was $8,305,433.71 and that Foster could get no credit for the value of the collateral or the property transferred to the purchasers because PIM and Foster had no control over the collateral.  Shapiro's testimony would have countered this misperception.  The contested issue over the amount of intended loss would have then have been a question of how much the offset would have been, rather than if any credit should have been given at all.  The Court would have had to determine a value of the lots rather than give no credit.

<u>Witnesses from USA Today and the Wall Street Journal</u>

Trial counsel failed to investigate and subpoena records from the archive departments and call witnesses from the two listed publications to obtain proof that all of the articles / press releases were published as claimed by PIM.  Counsel should have learned from the results of the first trial and from Foster himself that there were witnesses from these publications that had knowledge of the press releases being displayed on their forum.  Counsel's failure to act allowed the Government witnesses to answer questions that were not applicable.  The witnesses were asked questions to which the answers were misleading to the jury.  For example, the witnesses were asked if anyone

from their company had written articles that appeared in the publications to which the answer was
"no."  Additionally, the witnesses claimed that they did not publish press releases.  While these
witnesses might have believed that the answers were correct, they may not have had the actual
first-hand knowledge to properly answer the question.  They obviously did not take into account
the actual factual assertions claimed by PIM on their website.  The press releases were published
or displayed with the news agencies just as PIM claimed.  The Government had called witnesses
from those publications who had no knowledge or reason to know about the press releases.
Admittedly, had counsel investigated and not been able to locate an informed witness with
firsthand knowledge about the published press releases, it would not have fatal to the case.
Testimony from Rhonda Harper and or from a representative from Vocus was enough to assert a
claim of good-faith, but a witness from the publication would have eliminated the prejudicial effect
of the Government's misleading strategy.

Prejudice

Had counsel investigated and called the witnesses from these publications, the results of
the trial would have been different.  The jury would have been able to see that the government was
asking irrelevant questions of witnesses to in an effort to mislead and that the assertions made on
PIM's website were factually accurate and made in good faith.

Witness from Vocus

Counsel failed to investigate and call a witness from Vocus.  In order to continue the theme
that Foster had acted in good-faith, it was important to show how it was reasonable to believe that
Foster's understanding of promoting the property through press releases was a normal business
practice.  Rhonda Harper had testified in a manner that supported this theory and even though her
testimony was sufficient to warrant a jury instruction for good-faith, additional testimony was

25

needed.  There is no doubt that a representative from Vocus was just as important because the witness would have testified to the entire process used to promote an idea, product, or company. Specifically the witness would have testified that they charged a fee of $60,000 to PIM for the purpose to distributing information, i.e., press releases.  Vocus requires the PR departments of client companies to write the press releases and suggests a format that includes using certain words that will likely be picked up in more user searches and to use a style that reflects a news story. And finally, the Vocus representative would have testified that they definitively distributed press releases that were picked up by the news outlets represented and that PIM followed industry protocol.

<u>Prejudice</u>

Had counsel called a witness from Vocus, the results of the trial would have been different. The jury would have been able to understand how Foster had an honestly held opinion or an honestly formed belief that the claims he made on the company website were based on facts and because of this belief, there was no fraudulent intent.  Counsel's failure to call a witness from Vocus contributed to forfeiting a viable good-faith defense.

<u>Appraiser Dwight R. Watkins</u>

Counsel failed to call a Government certified appraiser/expert during the defense case-in-chief. Dwight Watkins had appraised the individual one acre interior lots at $285,000.00 each, and $335,000.00 for the beachfront lots.  This witness and the information were available for trial.[12] The purpose of the introducing this testimony was twofold.  First, it would have helped establish

---

[12] If it is determined that Watkins could not have been made available for trial, Appraiser Roger Sands could have been called as a similar alternative.  Sands had testified at the sentencing hearing.

the value of the land for the purposes of crediting and offsetting the intended loss as discussed previously. Second, it would help establish the baseline for the perceived value that Foster and PIM used to determine a fair value when selling or borrowing against the land. This would have helped the jury understand Foster's state of mind. Tying this witness into the good-faith defense was important because a question could have been asked: "Would the seller be demonstrating good-faith by selling these lots for the amount of money they sold for?" The answer would have been "yes!"

Prejudice

Had counsel questioned the existing witnesses in the manner alleged within this sub-claim, and had counsel called the witnesses listed within this claim, the results of the trial would have been different. First, the continuing theme of good-faith would have been reinforced to the jury so that the jury could see how it was reasonable to believe that all of Foster's actions were carried out by a business man that was trying to operate within legal guidelines and within normal industry standards. And finally, the additional testimony would have made a difference in the sentencing range in the unlikely event that the jury did not acquit Foster based upon good-faith. The introduction of competent substantive evidence of property ownership and value would have reduced the sentencing range by as much as 20 levels. Counsel's deficient performance effectively negated a viable defense rendering the trial, fundamentally unfair and in the alternative, caused the Defendant to be sentenced to a much harsher sentence than the one he should have received, but for the lack of evidence proving ownership and value that should have been introduced at trial.

### D.
### COUNSEL FAILED TO REQUEST A SPECIAL JURY INSTRUCTION THAT INCLUDED A GOOD-FAITH DEFENSE UPON THE RELIANCE OF COUNSEL

This sub-claim to ground one adopts the claim that counsel failed to call attorney Frank Ferrari as a witness. Had counsel pursued this defense, he would have called attorney Ferrari and requested the 11th Circuit pattern jury instruction 18, Good-Faith Reliance upon Advice of Counsel. Good-faith reliance on counsel can be a critical line of defense for the accused in white-collar prosecutions where transactions are often complex, slightly unorthodox, and the question of intent is the crux of the case. Although typically referred to as the "advice of counsel defense," that formulation is something of a misnomer that may suggest an unduly constricted view of the doctrine. Reliance on counsel is properly understood as part of a broader category of evidence of good-faith that may negate the Government's claim of unlawful intent, rather than as a formal defense requiring a defendant to demonstrate specific factual elements. As stated previously, good-faith is not categorized as an affirmative defense, but rather a defense that rebuts an element of the crime - intent.

Testimony supporting a good-faith reliance on counsel was not only limited to attorney Ferrari, it could have been introduced through another or many lawyers hired by PIM as well as testimony of the Defendant.[13] To explain how the evidence could be introduced and the proper instruction given, we can look to a Second Circuit case *United States v. Scully,* 877 F.3d 464 (2d Cir. 2017) to provide some useful insight.

The primary issue on appeal in *Scully* was whether the trial court improperly excluded evidence relating to the good-faith reliance upon advice of counsel defense asserted by the defendant, William Scully. Scully also challenged on appeal the trial court's jury instructions on that defense. Scully had been found guilty of mail and wire fraud and conspiracy in connection with the importation and distribution of misbranded and unapproved pharmaceuticals. Scully

---

[13] The Defendant is not alleging that he was going to testify; only that he could have if trial counsel needed a vehicle to get the testimony on the record.

founded a company called Pharmalogical to serve as a wholesale distributor of pharmaceutical products to retail customers. In 2009, Pharmalogical began importing foreign versions of FDA-approved products available from European distributors at reduced prices. Scully and his partner retained an attorney, Richard Gertler, to research the legality of reselling the imported products in the United States. Gertler issued two positive opinion letters in 2009.  In March 2012, agents of the FDA executed search warrants at Pharmalogical offices. Thereafter, Gertler and two other attorneys—Peter Tomao representing Scully individually and another lawyer representing Scully's partner—met with prosecutors. In April 2014, Scully and his partner were indicted on charges of willfully importing foreign versions of pharmaceuticals not approved by the FDA and reselling them in the United States under materially false and fraudulent pretenses. Scully's partner entered into a cooperation agreement with the Government and pled guilty. Scully proceeded to trial, asserting that he lacked the requisite criminal intent because of his good-faith reliance on advice from Gertler and Tomao regarding the legality of his conduct. Scully called Gertler to testify, but his testimony was undermined by the Government's evidence that Scully provided Gertler with false or incomplete information.  Scully did not call Tomao to testify, but sought to introduce evidence of Tomao's legal advice through Scully's own testimony that Tomao had given his oral approval to the transactions. The Government objected, and the district court did not permit the evidence, at first ruling that it was hearsay, and then when the defense demonstrated that it was not because it went to Scully's state of mind, ruling that the evidence's probative value was outweighed by its risk of unfair prejudice. In so ruling, the court pointed out that Tomao was "readily available" to testify at trial because he generally was "in court every day." The court's instructions to the jury on the advice-of-counsel defense stated that the defendant had the "burden of producing evidence" to show that he: (1) sought the advice of counsel honestly and in good-

faith prior to committing any of the crimes; (2) fully and honestly placed all the facts before his counsel; and (3) followed his counsel's advice in good-faith and honestly believing it to be correct and intending that his actions were lawful. The court explained to the jury that if it found these elements established, the defendant would be acquitted of the crime even if the jury found that the Government had proven guilt. On appeal, Sully challenged the district court's exclusion of evidence regarding Tomao's legal advice and the instructions to the jury. The Second Circuit panel ruled that Scully's proposed testimony was not hearsay, and that it was inappropriate for the trial court to require that the testimony be offered through Tomao. Tomao's absence, among a host of other lines of attack, could be raised by the Government to challenge the weight and credibility of Scully's testimony, but such matters did not render the evidence inadmissible. The Government was also free to call Tomao as a rebuttal witness. Nevertheless, Scully was competent to testify about his state of mind, and determining the persuasiveness of that testimony was "the province of the jury alone." *Id.* Because evidence regarding the advice of a second, well-qualified attorney was "extremely important" to Scully's defense, the court ruled that barring the evidence was not harmless and Scully was entitled to a new trial.

Further, although the Second Circuit found that at trial Scully had waived any objection to the jury instruction regarding advice-of-counsel, the court offered guidance to the district court for use on retrial. The court explained that "[i]n a fraud case … the advice-of-counsel defense is not an affirmative defense that defeats liability even if the jury accepts the Government's allegations as true." Rather, evidence of good-faith reliance on the advice of counsel can raise reasonable doubt as to whether the Government proved the requisite element of unlawful intent. Thus, once facts exist in the record providing a sufficient foundation, a trial court must give an good-faith reliance upon advice of counsel instruction that advises the jury clearly that the burden to prove

unlawful intent beyond a reasonable doubt at all times remains with the Government. The appellate court explained that the district court's instruction that Scully had "the burden of producing evidence to support the defense", *id*., and had to satisfy the elements of the defense may have been confusing to the jury and impermissibly shifted the burden of proof. The court provided examples of preferred instructions, recommending a charge that expressly informed the jury that the burden at all times remains with the Government and the defendant need not establish his good-faith .

The evidence of good-faith in the instant case goes much further than what was established in *Scully*. The evidence that would have been introduced through testimony of Foster's attorney would have included that Foster (1) had sought the advice of counsel honestly and in good-faith prior to committing any of the crimes; (2) fully and honestly placed all the facts before his counsel; and (3) followed his counsel's advice in good-faith and honestly believing it to be correct and intending that his actions were lawful.  In simpler terms, after disclosing all material facts and PIM's business plans to attorney Ferrari, defendant Lawrence Foster relied upon advice of counsel and believed that PIM had lawful ownership of the property which authorized him to mortgage, sell, advertise, and promote the property and that the option contracts were considered a valid sale that any and all of the purchasers could exercise on their own.  All loans were properly collateralized by the properties identified to the lending client and the executed celebrity endorsement contracts were valid.  Counsel's performance was deficient by failing to request the good-faith reliance upon of counsel jury instruction.

Prejudice

Had trial counsel introduced testimony of good-faith reliance upon counsel and requested the special jury instruction on that defense, the results of the trial would have been different.  First, the requested instruction would have been given or the case would have been reversed on appeal.

Next, the jury would have had the opportunity to acquit based upon the evidence presented that Foster had in good-faith relied upon the advice of counsel after fully disclosing all material facts to the attorney. Trial counsel's deficient performance severely prejudiced the defendant because counsel's failure forfeited presenting a viable defense for which a pattern jury instruction has been written by the 11th Circuit Court rendering the trial fundamentally unfair.

E.
COUNSEL FAILED TO INCLUDE A GOOD-FAITH DEFENSE
DURING CLOSING ARGUMENT

Counsel failed to include a summation of good-faith, including reliance of counsel, to the jury during closing argument. This was the time for counsel to tie the good-faith defense together by reviewing the evidence in a clear, simple, concise way in order to lead the jurors to understand the law behind a verdict and to stress the burden of proof. Instead, counsel spent the entire time in closing argument attempting to rebut every point in the Government's case. For example, trial counsel went on and on about the history of the subject land and the chain of title. Counsel complained about how the Government continued to confuse the subject property with another parcel owned by Sunward in an effort to somehow taint the rights of ownership. This did nothing but continue a confusing ongoing argument between both parties and the jury was most likely worn out by hearing it over again. Counsel did not have to argue about this disputed issue, he only needed to show that PIM's attorney had advised Foster that he had a legitimate, unfettered interest in the property and had every right to conduct the business he was conducting. End of story. Foster was relying on the advice of his attorney and several different title opinions including the opinion from defense witness Ken Toppin, who had testified that the title was clear and had insured the title. The jury instruction expressly states that even if Foster's belief was mistaken, so long as he

32

had an honest belief, then there can be no intent to defraud. That is what a minimally competent and reasonable attorney as contemplated by the Sixth Amendment should have argued.

A good-faith argument over the use of press releases only needed to be that PIM and Foster had hired Vocus (PRWeb) to get the word out, advertise, and promote, just like a majority of major Fortune 500 companies do. The defense expert, Rhonda Harper, and testimony from a Vocus representative could have been summed up by saying "Foster had an honestly held opinion or an honestly formed belief" that he was acting lawfully and without the intent to defraud because his actions were consistent with the manner that digital media outlets performed in their everyday, customary manner of business. If the top 5 media marketing and distribution companies are mistaken in the way that they conduct business, then the jury instruction says that it is still not against the law for the Defendant to also engage in these industry standard practices. An honestly held opinion or an honestly formed belief *cannot form the basis for fraudulent intent – even if the opinion or belief is mistaken*. Foster was acting like many other businesses and had no reason to believe that there was anything wrong with the information posted on PIM's website which was all approved by its in house counsel. The jury needed to know that they could find Foster not guilty because of this reasonable, good-faith belief that what he was doing was not against the law.

PIM's announcement of Joe Montana's purchase / acquisition or the fact that other celebrities acquired property in Rum Cay falls in the same category. Based upon advice of counsel and Foster's own understanding of the celebrity contracts, Foster had an honestly held opinion or an honestly formed belief that he had every right to make the announcements through press releases and any reasonable person would believe that it would be proper to put that information on it's website with the intent on promoting the subject property.

The final argument by counsel should have been a comparison of beliefs between Lawrence Foster and Agent Cade Cannon.  Cade Cannon believed that it was a crime for PIM to sell property that was not 100% owned by them without disclosing who the other owners were at the time the agreement was made, claiming that Sunward's ownership was tainted without providing any substantive evidence that it was actually tainted.  Lawrence Foster, upon the advice of counsel, believed he could lawfully sell the property and to borrow against the property in a manner that was precisely as per the written agreements drafted by his attorney and that the title opinions from multiple sources caused him to believe that there were no title issues associated with the property.  Therefore, there was no deception or fraud committed by Foster.  Agent Cannon believed he had to stop the project before investors and purchasers lost money even though no investor had lost a dime.  There was no evidence to support his theory other than his unsubstantiated belief that PIM was selling property that they did not own and could not be sold because of title problems.  Lawrence Foster and PIM had honored every contractual obligation with its clients up until the time the Government arrested him and seized its accounts.

Prejudice

Had counsel properly argued a good-faith defense at closing, the results of the trial would have been different.  Counsel's failure forfeited two related viable defenses of good-faith.  Without the two separate instructions and an explanation of how the evidence supported a verdict of not guilty, the jury was left with limited choices.  Unfortunately, the jury only considered that the grantor on the option contract was Sunward Holdings while PIM claimed they owned the property and advertised as such for sale.  The jury had a choice to make and it was an easier decision to

34

believe that Sunward was the owner rather than believe the confidential agreement between Sunward and PIM that gave PIM full rights of ownership of the property.

A proper closing argument coupled with the court approved good-faith jury instruction would have offered the jury an option where they would not have had to make legal determination of ownership, but rather decide if Foster relied upon the advice of counsel in good-faith and had an honestly held opinion or an honestly formed belief that PIM had lawful ownership rights to the property and conduct the business of borrowing against, selling and promoting the property.

Counsel's deficient performance here severely prejudiced the Defendant because counsel's failure to argue the good-faith reliance upon counsel defense foolishly spurned two related and viable defenses, rendering the trial fundamentally unfair.

<u>Conclusion</u>

Defendant Foster has presented multiple examples of ineffective assistance of counsel in which he has demonstrated the deficient performance of counsel and has alleged the requisite prejudice pursuant to *Strickland*.   When considering the prejudice prong of *Strickland* in determining this cause, Foster has repeatedly alleged that the trial would have had a different result, but for counsel's deficient performance of failing to use a good-faith and good-faith reliance upon advice of counsel defense.   That assertion is supported by the juror letter that was addressed by this court post-trial. (DE 383) In that letter, the juror unequivocally stated that the Defendant had *"structured his business dealings to stay on the right side of the law"* and she and others jurors were "overwhelmingly bullied to disregard all of the evidence" presented on behalf of the defense. She blamed the foreperson, an attorney, who she claimed was biased and pressured her into her verdict.   Crucially, the affected juror clearly told the Court that the letter was not exhaustive of everything that happened in the jury room and expressed an eager desire to be heard further.   This

demonstrates that at least one juror, and according to her, "there were two other jurors" who felt

bullied and could see some good-faith, but were unaware of how that should have affected their

decision when deliberating. It is reasonable to conclude that had counsel presented this defense

throughout the trial, at least that at least one juror would have said not guilty.

WHEREFORE, the undersigned respectfully requests this Court grant the instant motion

by vacating the judgment, sentence and conviction. In the alternative, an evidentiary hearing

should be ordered to make any factual determinations regarding strategic or tactical decisions of

counsel.

Respectfully Submitted,

The Law Office of
ROBERT DAVID MALOVE, P.A.
200 S. Andrews Avenue, Suite 100
Ft. Lauderdale, Florida 33301
(954)861-0384

By:     /s/ *Robert David Malove*
        Robert David Malove
        Florida Bar No.: 407283

OATH

I HEREBY DECLARE under penalty of perjury that I have read the foregoing and the facts

contained herein are true and correct.

*Robert David Malove (on behalf of)*

LAWRENCE FOSTER

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of this motion was duly served on all attorneys of record by filing same with this Court's CM/ECF system, on this 3rd day of April, 2019, which will automatically and electronically provide such copy to said attorneys of record.

*/s/ Robert David Malove*
Robert David Malove, Esq.